# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Rebecca R. Pallmeyer | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 7212 | **DATE** | 9/24/2004 |
| **CASE TITLE** | Tina Alicea vs. Northwest Airlines, Inc. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] Enter Memorandum Opinion And Order. Defendant's motion for summary judgment ( Doc. No. 16-1) is granted.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | 2 number of notices | **Document Number** 26 |
|---|---|---|---|---|
| | No notices required. | | | |
| ✓ | Notices mailed by judge's staff. | | SEP 2 7 2004 date docketed | |
| | Notified counsel by telephone. | | | |
| | Docketing to mail notices. | | docketing deputy initials | |
| ✓ | Mail AO 450 form. | | | |
| | Copy to judge/magistrate judge. | | 9/24/2004 date mailed notice | |
| ETV courtroom deputy's initials | | | ETV mailing deputy initials | |
| | | Date/time received in central Clerk's Office | | |

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| TINA ALICEA, | ) |
| --- | --- |
| Plaintiff, | ) |
| v. | ) No. 02 C 7212 |
| NORTHWEST AIRLINES, INC., | ) Judge Rebecca R. Pallmeyer |
| Defendant. | ) |

**DOCKETED**
SEP 2 7 2004

## MEMORANDUM OPINION AND ORDER

Tina Alicea ("Alicea or "Plaintiff") was an employee of Defendant, Northwest Airlines, Inc. ("Northwest" or "Defendant") from 1977 until she was terminated on December 11, 2001. Defendant asserts Plaintiff was terminated for violating Northwest's Rules of Conduct by working overtime without permission, falsifying time records, and accepting pay for hours she did not work. Plaintiff admits submitting time records that overstated the hours she actually worked, but claims this was common practice at Northwest. She also claims management personnel either gave her permission to work the overtime hours in dispute, or witnessed her working overtime and did not send her home. Finally, Plaintiff contends other male employees who engaged in the same practices were not fired. Plaintiff filed this action, claiming that she was discriminated against based on her gender in violation of 42 U.S.C. § 2000e-2(a)(1). Defendant moves for summary judgment and, for the reasons set forth here, the motion is granted.

## FACTUAL BACKGROUND

The following facts are taken from the parties' Rule 56.1 Statements and Responses, as well as other evidence in the record.

Tina Alicea began working for Northwest Airlines in the air freight center as a secretary in 1977. (Complaint ¶ 12.) In 1986, Plaintiff became a Work Control Clerk, performing administrative work in the aircraft maintenance department; her regular shift was Monday through Friday, from

3:00 a.m. to 11:00 a.m. or 4:30 a.m. to 12:30 p.m. (Defendant's Rule 56.1 Statement of Undisputed Material Facts (hereinafter, "Def's 56.1") ¶¶ 6, 7; Luttenbacher Aff., Ex. C to Def's 56.1, ¶ 4.) Plaintiff's job duties including processing of payroll. (Complaint ¶ 15.) Dave Luttenbacher, Line Maintenance Operations Manager, became Alicea's direct supervisor in April 2001. (Def's 56.1 ¶ 11; Luttenbacher Aff. ¶ 3; Alicea Dep., Ex. B to Def.'s 56.1, at 49.) Plaintiff contends, however, that John Kasper and Mike Tempe, also managers, were "also able to lead and direct" Plaintiff's work. (Plaintiff's Statement of Uncontested Facts Pursuant to Rule 56.1, hereinafter, "Pl's 56.1," ¶ 1; Alicea Aff. ¶ 3, Ex. 1 to Pl's 56.1.) Plaintiff testified that these managers had authority to authorize overtime for her, and Luttenbacher's deposition testimony suggests that they did. (Alicea Dep., at 155; Luttenbacher Dep., Ex. 2 to Plaintiff's Response to Defendant's Motion for Summary Judgment (hereinafter, "Pl's Response"), at 15.) Luttenbacher testified, however, that when Mr. Kasper authorized Alicea to work overtime, he would report that to Luttenbacher. (Luttenbacher Dep., at 21.)

Plaintiff's responsibilities included "maintaining and updating computer databases; processing labor-related information; monitoring departmental issues to ensure compliance with federal regulations; handling customer problems; auditing certain paperwork; participating in special projects; training others on departmental procedures and systems; and maintaining, updating and providing technical data to support aircraft maintenance." (Def's 56.1 ¶ 9; Alicea Dep., at 24; Job Description, Ex. D to Def's 56.1.) Plaintiff's responsibilities also included replacing old pages with new pages in aircraft maintenance manuals. (Def's 56.1 ¶ 10; Alicea Dep., at 43, 55-7.) Prior to December 6, 2001, Luttenbacher considered Plaintiff a "good employee." (Pl.'s 56.1 ¶ 24; Luttenbacher Dep., at 9.)

A collective bargaining agreement ("CBA") between Northwest and the International Association of Machinists ("Union") governed Plaintiff's employment. (Def's 56.1 ¶ 8; Alicea Dep., at 17-18.) Plaintiff was also subject to Northwest's Rules of Conduct For Employees of Northwest

2

Airlines. (Def's 56.1 ¶ 15; Alicea Dep., at 27.) Among those rules was an absolute prohibition on the alteration or falsification of time cards and the submission of false information. (Def's 56.1 ¶ 16; Rules of Conduct for Employees of Northwest Airlines, Ex. F to Def's 56.1 (hereinafter, "Rules"), Rule No. 33.) The Rules state that falsification of records is a serious offense that justifies immediate discharge. (Def's 56.1 ¶ 17; Rules, General, at 2.)

Soon after he took on his management duties, in May 2001, Dave Luttenbacher made an announcement in the maintenance managers' room in which he explained that all overtime work had to be approved by management. (Alicea Dep., at 76-78; Termination Letter from Luttenbacher to Alicea, dated December 11, 2001, Ex. E to Def's 56.1, hereinafter, "Termination Letter.") Alicea admits that she was present for this announcement, though she points out that Luttenbacher was not speaking directly to her, and was instead addressing a group of people. (Alicea Dep., at 77-78; Alicea Aff. ¶ 5.)

Alicea was familiar with the overtime forms and had used them in the past. (Alicea Dep., at 102-106.) Luttenbacher stopped using those overtime forms, (Alicea Aff. ¶ 6; Pl's 56.1 ¶ 4; Luttenbacher Dep., at 22), in order to "save a tree" and instead, as he testified, relied directly on the employee's time sheet. (Luttenbacher Dep., at 22.) Luttenbacher did not explain what information in the employee's time sheet would indicate that overtime had been approved, but he testified that an employee's overtime work "would have shown up as time worked, but I would have known about it." (*Id.*)

## A. Events Leading to Alicea's Termination

Due to the Labor Day Holiday in 2001, the payroll department requested that clerical staff submit payroll records early, by Sunday, September 2, 2001. (Def. 56.1 ¶ 18; Alicea Dep., at 79, 83.) Luttenbacher asked Alicea if she could do it all on Tuesday and avoid working overtime that

3

Labor Day weekend and she responded that she could.[1] (Def's 56.1 ¶¶ 19, 20; Alicea Dep., at 85-86.)

Alicea contends, however, that after learning that Luttenbacher's secretary was out on leave (Alicea does not say when she became aware of this), she realized that she could not complete the payroll without working overtime on Sunday, September 2. (Pl's 56.1 ¶ 5; Alicea Aff. at ¶ 7.) In her affidavit, Alicea asserted that the secretary's absence resulted in additional work for her, which in turn affected her ability to finish the payroll in a timely fashion. (Alicea Aff. ¶ 7.) Defendant denies these statements as inconsistent with Alicea's deposition testimony. (Defendant's Responses to Plaintiff's Statement of Uncontested Facts Pursuant to Rule 56.1 ¶ 5, hereinafter, "Def's Responses to 56.1.") The deposition transcript does not contain an explicit question regarding any additional duties brought on by the secretary's leave, but the court notes that Alicea testified at length about that weekend and did not mention the secretary's absence. (Alicea Dep., at 78-86.)

Luttenbacher came into work that Sunday and asked Alicea why she was there. (Def's 56.1 ¶ 21; Alicea Dep., at 80; Termination Letter.) Alicea responded that she decided to do payroll but told Luttenbacher she would not put in the time to be paid for it. (Def's 56.1 ¶ 22; Alicea Dep., at 80-1.) Luttenbacher responded, "If you work, I will pay you for it," and then reminded Alicea that all extra hours needed to be approved by management. (Def. 56.1 ¶ 22; Alicea Dep., at 81.) Alicea worked the day, put in for the time, and was paid for it. (Alicea Dep., at 81.) She contends that John Kasper had authorized her to come in during the Labor Day weekend and complete the payroll, and that Kasper "knew I was there," Alicea Dep., at 79), but she admits she did not tell Luttenbacher that John Kasper had approved her weekend work.

On December 6, 2001, Luttenbacher noticed certain discrepancies in Alicea's time entries

---

[1] Although it is not clear from the record, the court presumes that Luttenbacher was referring to the Tuesday after Labor Day, Tuesday, September 4. Neither party explains why Luttenbacher instructed Alicea to finish payroll after the deadline of Sunday, September 2, requested by the payroll department.

and observed that she had made many entries manually, without management permission.² (Def. 56.1 ¶ 24; Luttenbacher Aff. ¶ 6.) First, for December 1, 2001, the time records showed that Alicea had made a manual entry showing that she worked from 6:00 a.m. to 10:00 a.m. (four hours), with coding that indicated pay for eight hours. (Def. 56.1 ¶¶ 25-26; Alicea Dep., at 55, 57-8.) Alicea contends that manager John Kasper had approved her working that Saturday, December 1, 2001. (Alicea Dep., at 57, 59.) She also contends that coding herself for eight hours of pay was an acceptable past practice within Northwest. (Pl.'s 56.1 ¶ 7; Alicea Dep., at 58-9.) Northwest denies this claim (Def's Responses to Pl.'s 56.1 ¶ 7), noting that it contradicts Alicea's deposition, where she testified that the practice of paying employees for eight hours when they actually worked fewer hours was limited to circumstances such as injuries or illness, training, travel or other special activities (none of which are at issue here). (Def's Responses to Pl.'s 56.1 ¶ 7; Alicea Dep., at 57-64-65, 67-69.)

A second discrepancy in the December 1, 2001 pay records was that Alicea coded her time for that day as a Trade Day Worked. (Alicea Dep., at 61.) A "Trade Day Worked" is a reference to circumstances in which Northwest allows an employee to work a Saturday or Sunday and trade that weekend day for a weekday on which she did not work and did not receive pay. (Luttenbacher Aff. ¶ 8.) Alicea coded December 1, 2001 as a Trade Day Worked in exchange for Thursday, November, 29, 2001, but she had already been paid for that Thursday. (Alicea Dep., at 61.)

A third payroll records discrepancy involved Alicea's December 3, 2001 entry. (Def.'s 56.1 ¶ 29.) Alicea had left work at 12:30 p.m. that day but manually clocked out at 1:30 p.m.³ (Alicea

---

² Luttenbacher claims that on December 6, he and Alicea were reviewing all employee payroll records for discrepancies. (Luttenbacher Aff. ¶ 6.) Alicea denies her records were reviewed and asserts that no time sheets were discussed during this meeting. (Pl. Response to Def. 56.1 ¶ 24; Alicea Aff. at ¶ 8.) She does not challenge Defendant's assertions regarding the time entries, however.

³ Neither party explains how Luttenbacher detected this discrepancy from a review
(continued...)

Dep., at 52; Termination Letter.) Luttenbacher questioned Alicea about this discrepancy (apparently on December 6) and, according to her testimony, she claimed it was a typographical error. (Alicea Dep., at 52-3.) Luttenbacher, however, claims that Alicea initially told him she had worked until 1:30 that day, until he reminded her of a voicemail from that day indicating she already left at 12:45; at that point, according to Luttenbacher, Alicea told him she must have made the entry by mistake. (Luttenbacher Aff. ¶ 9.) Following his discovery of these discrepancies, Luttenbacher further reviewed Alicea's payroll records and discovered she had worked and was paid for twelve weekend days between September and December 2001, but only had manager approval for two of those days. (*Id.* at ¶ 11.)

Based on the discrepancies in Plaintiff's time records, Luttenbacher conducted an interview with her on December 7, pursuant to Northwest's information gathering policies, using a set of written questions that both Luttenbacher and Plaintiff signed. The parties refer to this interview session, and to the document, as "Q and A." (Def. 56.1 ¶¶ 33-4; Luttenbacher Aff. ¶ 12; Alicea Dep., at 88; Q and A for Tina Alicea, Ex. G to Def.'s 56.1, hereinafter, "Q and A form.") Jerry Cross, a union representative, was present on Alicea's behalf, and Paul Paraskevopoulas was present as a witness for Northwest. As reflected in the Q and A form, Alicea admitted working twelve weekend shifts when management had only approved two of those days. (Def. 56.1 ¶ 38; Q and A form.) In her deposition testimony and later affidavit, however, Alicea contended that there were numerous times that managers saw her at work or spoke to her on the phone on the days in question. (Alicea Dep., at 89-93; Alicea Aff. ¶ 14.) Because those managers did not send her home, Alicea inferred she had permission to be at work. (Alicea Dep., at 89-90; Alicea Aff., ¶ 13.)

In addition, on several days which Alicea manually recorded she had worked, security records did not show that she had actually entered the airport. (Def. 56.1 ¶ 41.) At the December

---

[3](...continued)
of the payroll records.

7 session, Luttenbacher asked Alicea whether she had swiped her security badge upon entering and leaving the airport on certain days in question. She answered that she did so on December 3, 2001 only on the way in, but did not swipe her badge at her exit that day or on other days in question. Alicea refuted any allegation of not being at work on certain days by explaining that a friend at the gate regularly waved her in without having to swipe a badge.[4] (Pl. Responses to Def.'s 56.1 ¶ 41; Alicea Aff. ¶ 15.) The court notes that Alicea did not offer this explanation to Luttenbacher when he initially asked her about the manual entries in her records. (Luttenbacher Aff. ¶ 10.) Instead, she asserted this justification in her later affidavit, dated October 16, 2003. (Alicea Aff. ¶ 15.)

Plaintiff was suspended on December 7, 2001 after the interview session and was terminated on December 11, 2001. (Def's 56.1 ¶¶ 45-46.) Luttenbacher terminated Alicea on December 11, 2001 because she knowingly recorded time in the payroll system that she did not work, worked weekends without manager authorization, entered trade days worked without a trade day off, and accepted pay for time she did not work. (Def.'s 56.1 ¶ 46-7; Termination Letter.) Relevant portions of the Termination Letter from Luttenbacher to Alicea include the following:

> The reasons for your discharge are as follows:
>
> On December 3, 2001 you left work at 12:30pm - when your PACE records were reviewed, you manually clocked yourself out at 1:30pm.
>
> On Saturday December 1, 2001 you did not have permission from a manager to be at work, yet stated you worked from 6:00am to 10:00am although you did not punch in or out. In addition, you coded yourself paid for 8 hours. You stated that you did this based on past practice. I have reviewed this with your previous managers and they were not aware of any special arrangements. You coded your time as a Trade Day Worked (TDW) and stated it was for Thursday, November 29, 2001. You were already paid for that day when you used a Birthday Holiday.
>
> When I first started at ORD, I made it clear that any overtime would need to be approved through management. On Sunday, September, 2, 2001 I saw you at work and questioned why you were there. You stated you had to finish some things for

---

[4] The Plaintiff does not offer much explanation about what it means to be "waved in" but the court presumes Plaintiff could get into the airport without swiping her security badge, thereby leaving no electronic record of her entrance and exit.

7

Monday and would not charge the Company.

I stated that if you work you should be paid, but all extra hours should be approved through management.

Upon a review of your PACE records, you have entered time for 12 weekend shifts since our discussion in September and management has only approved two. A further review shows numerous weekend shifts worked without management permission resulting in 8 hours of additional pay for only 4 hours of work on each of those weeks.

Based on the above facts you have violated the following Rules of Conduct For Employees of Northwest Airlines: Rule 33 (Time Cards and Other Records). You knowing [sic] entered time in PACE that you did not work, worked on days that you were not authorized to work, and entered trade days worked without a trade day off.

Be advised that each of the above-referenced charges, standing alone, constitute sufficient cause for your termination.

(Termination Letter, Ex. E to Def's 56.1.)

At her deposition, Plaintiff acknowledged the truth of the charges in the Termination Letter.[5] In this lawsuit, however, she contends that Northwest managers on duty saw her at work on the weekends and did not send her home, which she interpreted as permission to be there. (Pl.'s

---

[5] Specifically, Alicea testified as follows:

Q: The last paragraph on the first page of the December 11th letter says, "Upon a review of your PACE records, you have entered time for two (sic) weekend shifts since our discussion in September, and management had approved only two." Was that correct?
A: Yes.
Q: Then it says, "A further review shows numerous weekend shifts worked without management permission resulting in eight hours of additional pay for only four hours of work on each of those weeks." Was that correct?
A: Yes.
Q: The next page says that you –says, "You have violated the following Rules of Conduct for Employees of Northwest Airlines: Rule 33 (Time Cards and Records)." Was that correct?
A: Yes.
Q: It says, "You knowing - I think you meant knowingly - entered time in PACE that you did not work, worked on days that you were not authorized to work, and entered trade days worked without a trade day off." Was that correct?
A: Yes.

(Alicea Dep., at 86-7.)

8

Responses to Def.'s 56.1 ¶¶ 25-26, 38; Alicea Aff. ¶¶ 9, 13-14.) In her testimony, Plaintiff identified the following dates on which she claims members of management saw her at work or spoke to her on the phone while she was at work: September 2, November 3, November 24, and December 1 of 2001. (Alicea Dep., at 90-91.) Alicea also explains that she did not punch in and out on the weekends pursuant to a policy under which stated an employee would receive pay for eight hours, even if she only worked four on weekend days. (Pl.'s Responses to Def.'s 56.1 ¶ 39; Alicea Aff. 9.)[6]

Defendant denies any such policy exists, (Def. Reply Memorandum in Support of its Motion for Summary Judgment, at 8 (hereinafter, "Def's Reply")), and the court agrees with Defendant that the record submitted by Plaintiff does not indicate any evidence, other than Alicea's own statements, of such a policy.[7] In her deposition, Alicea explained that for certain extracurricular events, such as training sessions or CPR classes, employees would be paid for eight hours when those activities actually took fewer hours. (Alicea Dep., at 58, 62-63, 68.) She also testified that employees who were sick or injured could receive eight hours pay even if they actually worked fewer hours; Plaintiff herself benefitted from this practice on one occasion. (Alicea Dep., at 73-76, 123-125.) Defendant admits that employees on special off-site assignments, such as CPR training or road trips, were not required to swipe their badges and were allowed to have their time manually entered. (Def's Responses to Pl's 56.1 ¶ 2.) Northwest notes, further, that Alicea acknowledged in her deposition that employees paid for eight hours when actually working fewer under those circumstances had management authorization to do so. (Id.; Alicea Dep., at 58-69.)

---

[6] Alicea did not explain how such a policy would excuse a worker from punching in and out on weekend days.

[7] She identified Ken Lewis as a Northwest employee who had knowledge of the purported practice of paying an employee for eight hours even if he/she had worked only four hours (Alicea Dep., at 139-140), but she has not offered a statement from Lewis (or any other Northwest official) confirming her assertions about this policy.

## B. Alicea's Post-Termination Actions

Alicea filed a grievance with the union in accordance with the CBA on December 12, 2001. (Alicea Dep., at 106; Def.'s 56.1 ¶ 48.) At the grievance hearing on December 20, 2001, Alicea admitted that she had made a mistake and that she knew right from wrong but asked for a "last chance agreement." (Alicea Dep., at 107-8; Def.'s 56.1 ¶ 49.) A "last chance agreement" is an agreement between Northwest and a terminated employee giving the employee one last chance to correct his behavior but providing that the employe3 will be subject to immediate termination if he commits any further violations in a certain time period. (Luttenbacher Aff. ¶ 16.) Alicea's grievance was denied. (Alicea Dep., at 109-111; Def. 56.1 ¶ 51.) In her affidavit, Alicea claims that she made the comments at the grievance hearing regarding making a mistake and knowing right from wrong on the advice of her union representative, who told Alicea she would be reinstated if she did so. (Pl.'s 56.1 ¶ 15; Alicea Aff. ¶ 16.)

## C. Alicea's Allegations of Sex Discrimination

Plaintiff contends that her termination on the basis of discrepancies in her time records constitutes sex discrimination. She asserts that male coworkers guilty of similar offenses were treated more favorably. Specifically, Plaintiff names Stan Decaluwe, an Inspector/Trainer, who worked overtime without permission and was not terminated. (Pl.'s 56.1 ¶ 17; Alicea Aff. ¶ 18.)[8]

---

[8] Northwest contends this statement is inadmissible, as it contradicts Alicea's deposition, in which she was unable to recall the names of any employee who worked unauthorized overtime but was not fired. (Def.'s Responses to Pl.'s 56.1 ¶ 17.) As the Seventh Circuit has explained, "[a] party may not create a genuine issue of material fact by contradicting his own earlier statements, at least without a plausible explanation for the sudden change of heart." *Unterreiner v. Volkswagen of America, Inc.*, 8 F.3d 1206, 1210 (7th Cir. 1993) (citing *Richardson v. Bonds*, 860 F.2d 1427, 1433 (7th Cir. 1988).) "[W]here deposition and affidavit are in conflict, the affidavit is to be disregarded unless it is demonstrable that the statement in the deposition was mistaken." *Adusumilli v. City of Chicago*, 164 F.3d 353, 360 (7th Cir. 1998) (quoting *Russell v. Acme-Evans Co.*, 51 F.3d 64, 67-68 (7th Cir. 1995).) Alicea did mention Decaluwe's name at her deposition, but only as an employee who was permitted to leave early due to a family emergency, and was paid pursuant to the instruction of supervisor Jim Davis. (Alicea Dep., at 120.)

Northwest notes that Decaluwe was not a similarly situated employee. (Def. Responses to Pl.'s 56.1 ¶ 17; Luttenbacher Aff. ¶¶ 2-6, Ex. 2 to Def's Motion for Summary Judgment.) In fact, Mr. Decaluwe has a different job title, reports to a supervisor in Minneapolis, and only reports to Luttenbacher regarding training matters. (Luttenbacher Aff. ¶¶ 3-4, Ex. 2 to Def's Motion for Summary Judgment.) Luttenbacher asserts that he is unaware of Mr. Decaluwe ever working overtime without permission, ever falsifying time records, or ever accepting pay for time he did not work. (*Id.* at ¶¶ 5-6.)

Plaintiff also identifies Bill Zawadski, Luttenbacher's secretary, as a male coworker who received more favorable treatment. According to Alicea, Zawadski regularly worked weekends under Luttenbacher's predecessor, (Pl.'s 56.1 ¶ 17; Alicea Aff. ¶ 18), and often came in late and left early under previous managers as well as under Luttenbacher. (Alicea Dep., at 130-33.) Alicea claims that sometimes Zawadski had permission for such actions and sometimes he did not. (*Id.* at 132-33.) She testified that Zawadski received permission to work fewer than eight hours when he injured his ankle. (*Id.* at 73.) She also asserted in her affidavit that she had on occasion swapped weekend shifts with Zawadski. (Alicea Aff. ¶ 18.)

Another male employee who allegedly received more favorable treatment was John Pitsafferrato. Alicea testified that Mr. Pitsafferrato owned a snow plowing business and would snow plow the parking lot on company time. (Alicea Dep., at 69.) According to Alicea, with the approval of supervisor Jim Davis, Pitsafferrato received a paycheck for working a full eight hours, as well as a separate paycheck for his snow plowing work, even when the snow plowing took place during Pitsafferrato's regular eight-hour shift. (*Id.* at 70.) Alicea did not explain when this practice occurred.

Plaintiff also named other female coworkers, Carol Cullen and Joan Andreoni, who she claims were paid for more hours than worked and were not terminated. Plaintiff testified that approximately six years earlier, Ms. Andreoni would occasionally arrive late or leave early. (*Id.* at

11

70-72.) Plaintiff acknowledges that former manager Richard Stachura approved Ms. Andreoni's practices. (*Id.* at 72.) In 2001, Ms. Cullen was a stockroom employee reporting to Dave Luttenbacher who left work early on occasions for medical treatment but was paid for eight hours. (*Id.* at 123-4.) Alicea acknowledged that these departures were authorized by the union contract, but asserted that Ms. Cullen should have returned to work after her appointments. (*Id.* at 124.)

The court notes that during her deposition testimony, Plaintiff admitted Luttenbacher did not discriminate against or treat her unfairly because of her sex. She testified:

> Q: Did he [Luttenbacher] ever demonstrate hostility towards you?
> A: No.
> Q: Did he ever treat you unfairly?
> A: No.
> Q: Did you ever feel he was out to get you?
> A: No.
> Q: Do you feel he is a truthful person?
> A: Yes.
> Q: Did he ever make any statement or take any action that would indicate that he was prejudiced in any way?
> A: No.
> Q: Did he ever discriminate against you because of your sex?
> A: No.

(Alicea Dep., at 50.) In her affidavit, Plaintiff disavows this testimony, explaining that she was referring only to the time during her employment with Northwest. After her suspension, she contends, she was subjected to discrimination and unfair treatment.

## DISCUSSION

### A. Summary Judgment Standard

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). The party seeking summary judgment carries the initial burden of demonstrating the lack of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A genuine

12

issue of material fact exists "only if there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Baron v. City of Highland Park*, 195 F.3d 333, 338 (7th Cir. 1999), citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Sufficient supporting evidence, not mere allegations of an existing factual dispute, must be presented by the nonmoving party to support a verdict in his favor. *Basith v. Cook County*, 241 F.3d 919, 926 (7th Cir. 2001).

Further, the Seventh Circuit has recognized that courts must apply the summary judgment standard with rigor in employment discrimination cases because "motive, intent and credibility are crucial issues." *Crim v. Bd. of Educ. Of Cairo Sch. Dist. No. 1*, 147 F.3d 535, 540 (7th Cir. 1998). Nonetheless, noting that employment discrimination cases are not governed by a separate rule of civil procedure, the Seventh Circuit recognizes that summary judgment may be appropriate in such cases so long as there is no genuine dispute as to the material facts. *See Wallace v. SMC Pneumatics, Inc.*, 103 F.3d 1394, 1396 (7th Cir. 1997).

## B. Alicea's Claims of Sex Discrimination

Section 703(a) of Title VII of the Civil Rights Act of 1964, as amended, provides that "[i]t shall be an unlawful employment practice for an employer. . . to discharge an individual . . . because of such individual's race, color, religion, sex or national origin." 42 U.S.C. § 2000e-2(a)(1). In this case, Alicea bears the burden of establishing that Northwest discriminated against her. She may do so under the "direct method" either by presenting evidence which, if believed by the finder of fact, "will prove the particular fact in question without reliance upon inference or presumption," or by offering circumstantial evidence that establishes a "convincing mosaic" of discrimination. *Volovsek v. Wisconsin Dep't of Agriculture, Trade and Consumer Protection*, 344 F.3d 680, 689 (7th Cir.2003); *Cerutti v. BASF Corp.*, 349 F.3d 1055, 1061 (7th Cir.2003). Alicea does not claim to have any evidence of discrimination supporting the direct method of proof and must therefore proceed under the familiar *McDonnell Douglas* burden-shifting analysis. *McDonnell Douglas Corp.*

13

v. Green, 411 U.S. 792 (1973).

Under that indirect method, Alicea can establish a *prima facie* case of discrimination by proving that (1) she is a member of the protected class; (2) she was performing at a level that met Northwest's legitimate expectations; (3) she was subject to an adverse employment action; and (4) she was treated differently than a similarly situated male employee. *Volovsek*, 344 F.3d at 690, (citing *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 897 (7th Cir. 2003) and *Stone v. City of Indianapolis Public Utilities Div.*, 281 F.3d 640, 642 (7th Cir. 2002).) If Alicea succeeds in making out a *prima facie* case, the burden shifts to Northwest to articulate a legitimate, non-discriminatory explanation for her termination. If such a reason is offered, Alicea bears the ultimate burden of showing that it is a pretext for discrimination. It is insufficient "for the employee to show that the employer acted incorrectly or undesirably" by firing her; instead, "the employee must show that the employer did not honestly believe in the reasons it gave" for the adverse decision. *Wolf v. Buss (America) Inc.*, 77 F.3d 914, 919 (7th Cir.1996).

Because it is undisputed that Plaintiff is a member of the protected class under Title VII, the court begins by considering whether or not she was performing at level that met Northwest's legitimate expectations. If a plaintiff fails to demonstrate that she was meeting her employer's legitimate employment expectations at the time of her termination, the employer may not be "put to the burden of stating the reasons for [her] termination." *Coco v. Elmwood Care, Inc.*, 128 F.3d 1177, 1179 (7th Cir. 1997).

Until Luttenbacher discovered the discrepancies in Alicea's payroll records, he considered her a good employee. Luttenbacher's opinion changed when he discovered Alicea had worked numerous hours of overtime without his express authorization. Upon further examination, Luttenbacher discovered multiple misrepresentations in her time sheets, including receiving pay for eight hours when working only four hours, and manual time entries that overstated the time Alicea actually worked. Luttenbacher followed Defendant's procedure in scheduling a "Q and A"

14

session and allowing Alicea to answer his accusations. At the Q and A session, Alicea admitted to misrepresenting her time records. She also admitted to working overtime without express authorization from her supervisors. These admissions defeat a finding that Alicea performed her job satisfactorily and to her employer's legitimate expectations.

Plaintiff asserts that on all of the days she worked overtime without express authorization, Northwest managers saw her working or spoke to her on the phone, but never sent her home. (Alicea Aff. ¶ 14; Alicea Dep. at 90-92.) Even construing these circumstances in a light most favorable to Plaintiff, the court concludes they do not create a dispute of material fact. Plaintiff has not suggested that her own manager, Dave Luttenbacher, observed her working on weekend days but took no action. Nor has she explained how other managers who observed her at work would have known that she had not been approved for overtime. Plaintiff herself clearly understood that such approval was required; her conduct on Sunday, September 2, 2001 confirms this. When Luttenbacher ran into her at work that day and questioned her being there, she told him she would not seek to be paid for her time that day. Luttenbacher chose to approve payment for that day, but reminded her again of the need for authorization for overtime work.

Although Plaintiff focuses on the issue of unauthorized overtime, the court notes that she has not responded to some of the other charges of misuse of time and falsification of records. She made manual time records and recovered pay for several days on which there were no electronic records of her presence at the airport. Either purposefully or mistakenly, she created a record that indicated she worked until 1:30 on December 3, though she left work one hour earlier. She recorded December 1 as a "Trade Day" for a day on which she had not worked, but had already been paid. She turned in time records seeking eight hours' pay for four hours' work; she contends this was consistent with Northwest policy, but Northwest denies such a policy exists, and Plaintiff's own testimony indicated it was limited to situations in which an employee was involved in training, was on a road trip, or was suffering from illness or injury. Given the overwhelming evidence of

15

Plaintiff's misrepresentations in pay records and her admitted violation of Northwest's Rules of Conduct, the court concludes that she has failed to show that at the time of her termination she was meeting Northwest's legitimate expectations.

If the court were to construe these violations as Northwest's articulated reason for her discharge, Plaintiff might attempt to suggest that the reason is pretextual; on this record, any such argument would have little traction. To establish that a similarly situated male employee was treated more favorably, a plaintiff must ordinarily demonstrate that she and the male employee "dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 617-8 (7th Cir. 2000). Long after her deposition testimony, Alicea recalled that Stan Decaluwe worked overtime without permission. Decaluwe, who had a different job title (he was an Inspector/Trainer), and worked under both Luttenbacher and another supervisor located in Minneapolis, is not similarly situated to Alicea, nor did she explain when it was that Decaluwe worked unauthorized overtime. Alicea also asserts that Bill Zawadski is another similarly situated employee, but her assertions about Zawadski all involve conduct that allegedly took place under the supervision of a prior supervisor, Luttenbacher's predecessor. By her own testimony, two of the three other workers Plaintiff identified–John Pitsafferrato and Joan Andreoni–had management approval for receiving additional pay. In any event, Carol Cullen and Andreoni are both female, so Northwest's alleged more favorable treatment of them would not create an inference of sex discrimination. Nor has Plaintiff presented evidence that any of her purported comparatives had falsified any records. *Cf. Russell v. Acme-Evans Co.*, 51 F.3d 64, 69 (7th Cir. 1995) (the fact that plaintiff calls into question one of the employer's articulated reason for adverse action "does not defeat summary judgment if at least one reason for each of the actions stands unquestioned.")

As in *Schuster v. Lucent Techs., Inc.*, 327 F.3d 569 (7th Cir. 2003), a case cited by Plaintiff

16

herself, Alicea offers no evidence that Luttenbacher did not honestly believe the reasons he gave for her discharge. Plaintiff also cites *Lawson v. CSX Transp., Inc.*, 245 F.3d 916, 931 n. 13 (7th Cir. 2001), where the court noted that an employer's shifting explanations for its refusal to hire a disabled worker can support the conclusion that those stated reasons are pretexts for discrimination. Here, in contrast, Northwest has never wavered in its position that Alicea's abuse of time and improprieties in time records were the basis for her discharge. Alicea asserted in her deposition that, in her view, "the punishment doesn't fit the crime" – that is, that her wrongdoing was not so grave as to warrant termination from her lengthy employment with Northwest. Northwest's Rules of Conduct state, however, that falsification of time records justifies immediate termination. As is often observed, the court is not a "superpersonnel department" and has no authority to review the wisdom of a personnel policy or the propriety of a defendant's business decision. *Stewart v. Henderson*, 207 F.3d 374, 378 (7th Cir. 2000).

## CONCLUSION

The evidence does not establish a *prima facie* case of sex discrimination. If it were to reach the issue, the court would find that Plaintiff has not met her burden of establishing that Northwest's stated reasons to discharge her were pretext for discrimination. Defendant's motion for summary judgment (Doc. No. 16-1) is granted.

ENTER:

Dated: September 24, 2004

REBECCA R. PALLMEYER
United States District Judge